We'll now turn to the next case on the calendar, which is United States v. Robert Hadden, 23-6822. Again, we'll allow a minute for counsel to get settled. Attorney Hutchinson, whenever you're ready, we're happy to proceed. Thank you, Your Honor, very much. May it please the Court, Kendra Hutchinson of the Federal Defenders on behalf of the appellant in this matter, Robert Hadden. I'd like to reserve two minutes for rebuttal, if the Court would permit me. Thank you. Your Honors, this was a unique prosecution that strained the bounds of the Mann Act, almost beyond recognition. The defendant here, Mr. Hadden, he'd already pled guilty in state court a decade before, and he conceded right from the beginning of the trial that the sex abuse had occurred. However, he raised a very subtle technical defense that really went to the federalization of this case, that he didn't induce the victims to cross state lines and that he didn't intend that they engage in the sexual activity at the time of the inducement. Given this defense, it was critical that the jury was instructed properly, and it was equally critical that the trial, writ large, was not distracted or inflamed by emotion. Unfortunately, that is not what occurred here. I would like to focus on the jury instruction issue first and really move on to the sentencing issues, Your Honors. Beginning with the jury charge, the Court here refused a very specific request to instruct that the government was required to prove that Mr. Hadden intended that the victims engage in unlawful sexual activity at the time of the inducement. That was the critical portion that the defense was requesting. That's the formulation you requested. That's right. That's exactly right, Your Honor, yes. So he did instruct, and I think this is at page 1079, it is enough if the defendant has the requisite intent at the time of the persuasion, inducement, enticement, and coercion, right? That was given, right? Yes, that was given, Your Honor. How was that not adequate to convey the defense's, you know, the issue that the defense wanted to flag for the jury? Yes. So first of all, that came pages after the actual intent charge, the one that the jury would be considering. How does that matter? The judge was probably talking to the jury for like an hour, I'm guessing, right? That's true in this case. That's right, Your Honor. But the problem is not just that it came much later in the charge, but it also came within a different charge. The charge itself, the jury instruction that this particular line was taken from is whether it is necessary that the jury find that the sexual activity was accomplished. That was not a defense in this trial. That was not an issue in this trial. This whole paragraph is about the purpose. I'm reading this whole paragraph, and it's a very detailed explanation to the jury about it's not necessary for the government to prove that the unlawful sexual activity was the defendant's sole purpose. They talk about different purposes and motivating and significant purposes. This whole paragraph was focused on issues surrounding intent. So it seems like topically it wasn't misplaced that this was a time when the court was giving a much more detailed and granular instruction on intent. So I understand the argument could be two things. One is, yes, it's a good instruction, but it was so misplaced that the jury wouldn't have noticed it. That doesn't strike me as particularly persuasive. The second issue is it is an erroneous instruction regardless of where it was placed. Are you making both arguments or neither? I just want to clarify one thing, Your Honor. The government actually pointed to two different sections of the charge. Well, there are more that support that. I think Your Honor might have referred to the second one first, which is the one I was going to. But to go to the motivating purpose one, the one that Your Honor is really asking me about right now. What's the matter with that? Well, there's nothing the matter with that charge, Your Honor. That is a correct statement of the law. And as we point out in our briefing, that comes basically directly from Mortensen of the United States, a seminal case from the 40s from the United States Supreme Court. And so we don't have any problem with that particular instruction that the motivating purpose, motivating or significant purpose was that they travel across state lines. We have no problem. There's the last line of that paragraph which says it's enough if he has the requisite intent at the time. That it doesn't, the government doesn't have to prove, it's not necessary to prove that the victim in fact participated in the activity. In other words, it could have been an unsubstantial, the inducement has to happen with the intent. And it doesn't matter whether the activity later plays out. This instruction seems to me to say focus on the moment of the inducement or the enticement. As long as you've got the inducement with intent, you've got this element of the crime. Am I reading that wrong? Well, no. So to drill down on this, you know, and I think we briefed this pretty extensively, but I really want, I've been thinking about this a lot about how to convey this to the court. So, you know, there is a difference between a motivating purpose or a motivation, which is what this language is, and an intention that the victims engage in these. What is that difference? I don't know. The first reason is that the Supreme Court said so in Mortenson. I'm not making this up, Your Honor. The Supreme Court said that you must have both the intention, the necessary intention, and the motivation. It does not say that the intention and the motivation are the same thing. The Supreme Court separates them out. I just think of motive as a reason for doing something, but that is not fall into the category of one of the mens rea happened to be listed in the statute. It's a reason for doing something that is sort of extra statutory. But if I shoot you and my motive is to kill you for whatever reason, if it happens to be that I'm charged with murder, then that motive is also the requisite intent. So motive and intent seem to me that motive is simply a reason or purpose for doing something that doesn't fold into mens rea. It's not that mentally they are two different things in your brain. An intent is different from your purpose. If it counts for the intent, you've got intent. If it doesn't, then it's another reason. That just happens to be interesting. So I think, Your Honor, I would agree with you that the definition of motive or motivation would be reason or purpose. That seems to be the sort of ordinary meaning. This is the purpose or desire that is driving somebody's or impelling someone's actions. I would agree with that. But we have to remember that the intent here is a specific intent. That the defendant bring about, cause a specific result. That these victims engage in sexual activity. This is not just an amorphous desire. So I think the difference is subtle but important. And I want to illustrate it. I was casting about for examples and I realized that this court already has an example. And that is United States v. Schaeffer, a case that is cited extensively in our briefing. And in that case, Your Honor, it's 851 F. 3rd 166. And in that case, the defendant was actually induced the victim twice. So the first time, he induced her to cross state lines in order to groom her or create a relationship with her. He did not engage in sexual activity with her then. He did not sexually assault her then. So he brought her over to New Jersey in order to offer her a job and get her information. The second, he directed her at that time to return the following day. The following day was when he sexually assaulted the victim. He was charged with one count of coercion inducement. The same exact charge here, 2422, section 2422. I think, Your Honor, we can say that the defendant's motivation throughout both of these incidents, both of these inducements would have been the same. The motivation was to engage in the sexual abuse of the minor. But the intention at the time of that first inducement was not to engage in sexual activity with her. It was to have her over to groom her or to create a relationship with her. Perhaps the jury obviously found it was for the second incident. But I think that that case, Schaeffer, perfectly exemplifies that. So I'm perplexed, though, given that the language Judge Nardini explained to you or quoted to you does say that this had to be at the time that he induced the person to travel, that the purpose had to be unlawful sexual activity. I'm not sure I understand your attempt to distinguish motive in the circumstances of this case. Perhaps you want to expand a little? Sure, sure. To apply it to the specific circumstances of this case, Your Honor, these were patient-doctor relationships that lasted. Well, could I just ask you, in responding to Judge Radley, as I understand the question, could you talk about it in terms of the jury instruction? Sure. I mean, I understand the facts, and then you can argue whether the facts demonstrate these elements. But I'm trying to figure out why this line that I've quoted has not adequately conveyed the element, which I think we're all in agreement about what the element of the crime is. Right. What is wrong with that sentence that I read you, the last line of the paragraph I quoted on 1079? Because from that, the jury could have concluded that while Mr. Haddon had an overarching purpose at all times, a motive to engage in sexual activity with these victims, that his overarching purpose or desire, but they would not necessarily... But it said requisite intent. So I'm trying to think, what is... It says intent. And just up a couple sentences before, it says the government must prove beyond a reasonable doubt, however, that a motivating or significant purpose was not just generally I want to have sex, but was that the victims travel across state lines to engage in unlawful sexual activity. That is exactly the element. And then it says, two sentences later... And, Your Honor, I... It is enough if that intent, he had that intent at the time of the persuasion inducement. What's wrong with that? I don't mean to contravene what Your Honor directed me to before, but here we have patient-doctor relationships that span many years in which Mr. Haddon asked victims to come back many times and did not engage in sexual activity... I'm sorry, you're going back to the facts. I understand that you think that the facts don't prove that contemporaneous intent, but to the extent you're arguing that the judge didn't tell the jury that it had to be contemporaneous intent, this quoted language seems to tell them exactly that. And I can only illustrate it by chakra, Your Honor. I can only illustrate that by... Well, can we do this? We've kept you up for a fair amount of time. Sure. Past the red light, but I wanted to make sure we cover some other issues here. If my colleagues are fine, would you mind turning to some of the, maybe a couple of the key sentencing issues? And if maybe I could direct you to one I'd be interested in hearing about, which is your argument about relevant conduct, number one, about including the other victims in relevant conduct, and then the second one about vulnerable victims. Sure. And I'd be interested in hearing from the government, of course, on this too, but if you could start by identifying for us where we will find the basis for the district court's conclusions on both of those points. And I understand your argument is that he didn't, but maybe talk about that. Sure. So Judge Berman committed several very serious procedural errors in this case, and Your Honor is pointing to one of them. I mean, of course, the other one is that he predetermined the sentence, and obviously that's an important point as well. But as to the vulnerable victim enhancements, so Judge Berman located his finding that the uncharged victims were relevant conduct under Sentencing Guideline 1B1.3A2, which is the same course of conduct or common scheme or plan. You know, as we argue at length in our briefs, this is explicitly by the terms of the Guidelines Manual not applicable to manned act prosecutions. And that's because they're not groupable in the same way. They're groupable by person. You get units for every person you abuse, but it's not like a tax case where you aggregate every person you abuse, and you have to pay a tax on every person you abuse. And that's why the government, in your view, and I think they agree with this, right, is limited to the argument that it was somehow in preparation for the offense or in the course of attempting to avoid detection or responsibility for the offense. That's right. And the government is not defending Judge Berman's ruling here. I just think that's important to note, that they're trying to find an alternate basis for this court to affirm it. And the alternate basis they're pointing to is, as Your Honor pointed out, 1B1.3A1A. So can I ask you maybe to cut ahead a little bit, and you can go back if you need to. On this issue, let's say we were to agree with you on relevant conduct. For purposes of the Guidelines calculation, are we talking about a two-point swing? Just as the relevant conduct, because you could still find that the statutory victims of the offense conduct were vulnerable. Put that aside for a minute, because I know you'll get there. But for relevant conduct, is that just a two-point swing? Because it gets you the number of vulnerable victims? If Your Honor is assuming that the four victims, charged victims, are vulnerable, then this would get us the two. Right. And I understand that you have an argument that even the statutory victims or the victims of the offense conduct were not vulnerable. I get that. You will argue why. But if we were to agree with you on only this point, we're talking about a two-point swing in the Guidelines, right? Yes, if Your Honor disagrees about the vulnerable victim aspect. Let me probe on these points for a moment. With respect to the large number of victims, am I correct in understanding the trial court to have made it plain that it was basing its sentence on the trial witnesses, such that even if there were large numbers of other women who were not somehow identified in charge conduct, the district court said it was basing its sentence on the trial witnesses? Well, I think Your Honor is pointing to the contradictions in Judge Berman's statements throughout the entire sentencing. So in the one breath, he did say that he was making a vulnerable victim finding on uncharged victims, and he said it explicitly. We contested it quite a lot. On the other hand, he did say that he was basing the sentence that he imposed only upon the trial evidence. And I think that that cannot be reconciled with the record here, however, Your Honor, because he also later stated in imposing sentences that there are 245 victims, that there are many victims here. So I think that this record, ordinarily I understand that the court can't affirm when the record gives assurances that the judge would have imposed the same sentence. I don't think this is the case. I think that the judge's errors in relying upon these uncharged victims, many of which the government conceded should not have been considered as well. I have a few other questions on this sentencing point. So if we were to remand, either because we find confusion or error or anything in between, even if this does not fall within the guidelines identification of relevant or related conduct, do you want to tell us that the district court couldn't consider these other victims as part of a non-guideline sentence? Yeah. You know, that's Section 3661, plenty of case law. You know, I understand that the conduct, that the history and characteristics and the circumstances that a court can consider is varied, and it's large. We understand that. But, you know, it is limited by due process concerns. We contested very, very, very heartily many of the victims' statements. We found errors that, you know, in them, like assertions about the ages of some of the people, et cetera. And we asked for a FATICO hearing. And, in fact, the government seemed to believe that there would be a FATICO hearing as well. And we were perfectly prepared to go forward, Your Honor, on the due process concerns. And we understand and we agree that that is what the law is, that if it's reliable, it can come in, and that the judge can consider it, along with other bad act evidence, right? You know, you stole from your church once if the judge wants to consider that, right? But here we asked for a FATICO hearing. We proffered, you know, ample reason for there to be one. There wasn't really serious pushback from the government as to there being one. We were preparing for it. And there wasn't one. And so I think this would have to be litigated again. And, Your Honor, I think this really comes to another part of this request, which I probably didn't make clear in my brief, and I'm sorry for that. I think this should be remanded to a different judge. One more question on this sentencing issue. Of course. If you bear with me. If I heard you correctly, it is the defense position that even the trial court has to consider. Let's talk about that. Do you have a position as to where along this continuum their vulnerability has to be manifested? Because it's a little hard for me to understand how a woman in the process of a gynecological exam is not vulnerable to a doctor who sexually abuses her during it. You say that's not the proper place to look for vulnerability? Yeah, I think Your Honor is looking to the circumstances, which is certainly, you know, this is a horrific act of sexual abuse, Your Honor. I just want to say that out loud, as we did at the trial before. We're not trying to minimize that. And, of course, someone is very vulnerable in that situation. But that's a circumstance. If someone, you know, there's many other vulnerable individuals. Any other person really undergoing any type of medical exam would be. And it can't be that every doctor's patient is vulnerable. Well, no. If I go in for an ear exam, you know, and I have all my clothes on and someone's just looking at my ear, it's a little different if I'm naked except for an examining gown and I'm lying on my back and I can't see what's going on. And then the doctor comes in when you're in that vulnerable position and then does this thing to you. You have to agree that's very different, right? Fair enough, Your Honor. And, you know, I'm sorry if what I said stains that for you. And I appreciate that you have acknowledged just how bad this activity is. But we're not talking about people who have come in for talk therapy and who are fully clothed and could just walk out the door in theory. Yes. I mean, they can't walk out the door. They're virtually naked. Absolutely, Your Honor. And he's taking advantage of that. So I guess that's I guess my question to follow up is how is that consistent circumstance, which, by the way, Mr. Haddon chose as the moment to abuse people. He chose to operate or to conduct this activity in the moment of his victim's greatest vulnerability. How do we how do we ignore that? No, I appreciate everything Your Honor is saying. And I want to acknowledge it as well. So thank you. You know, I think I think we have to look to the court's case law. And in the past, in McCall and Curley, this court has has really focused on obviously you require this nexus to the criminal conduct. And maybe maybe that's what we're talking about here as to this sort of instance on the during the exam. But the problem is, is that the court in the past has required that the defendants single out these victims from the larger class of potential potential victims. And I don't think that is present with these victims. So that is a requirement of this court's law. Now, now the court could decide to go in a different direction, I suppose, although we haven't breached it. And if so, I. I don't want to be too sarcastic about this, but I have a feeling I'm going to be. I mean, you're not suggesting that because he did it to lots of his patients as opposed to identifying, you know, a particular subset of his patients, that that's mitigating somehow. Well, I'm not I'm not saying it's mitigating your honor, but, you know, the government is relying very much on the the pregnancy rationale, for example. And there really is no evidence that he targeted, for example, pregnant patients versus other patients. And so there's an OBGYN. I mean, he is serving a vulnerable population. The fact that he only has at his disposal a pool of people who are going to be in a vulnerable position seems to me he can't escape it. Well, all of my potential victims were vulnerable, so now you have to show they're extra vulnerable. It's bizarre to me. So, I mean, I think your honor is looking for to, you know, for a rule that people who are, I guess, nude and naked and vulnerable in these sort of situations would be deemed vulnerable victims as a matter of law. I don't I don't know that that really works with the case law that this court has. Well, he found it. So we're just reviewing it. Well, he found it based upon their individual characteristics. Your honor, he did not find it based on the judge. We did not find it based on what we're talking about here. He found it based upon one of them being Orthodox Jewish and one of them never having had a gynecological exam before. And, you know, and why is that problematic? I would think that's consistent with your view that it couldn't just be identifying the subset people who either never had a gynecological exam before or whatever other characteristics he identified. Because there is no commonality between these victims. And this court's case law has required that. It's not that each individual victim be vulnerable. It's that there's a class. They have to all be vulnerable in the same way? I mean, I think that's what the law has said. If you have four people who are extraordinarily individually vulnerable and a criminal preys on them in an individualized way and looks for people who are personally vulnerable, then he gets out of it? I mean, I think your honors have in the past. I think that we are looking towards characteristics that unite the victims. I think that is what the defendant preys upon these characteristics. I don't think you can argue that. I mean, we've had any number of fraud, financial fraud cases, and one victim is the widow and the other victim is the orphan. And the other victim is, you know, someone who's got mental deficiencies. The fact that they're not all of a class doesn't mean they weren't each vulnerable. I mean, you know, we have to look at the purpose of the guideline. The guideline is meant to distinguish certain victims who were particularly vulnerable to the crime. And that the guidelines suggest is a factor that the court reasonably gets to consider. I'm hard-pressed to not say that to find error here by the judge. Well, I'm not going to press your honor on this anymore and just say, you know, assuming what your honors are speaking about, and you too, Judge Nardini, you know, we do not have a large number here. Can we just pause here, because I think Judge Murrell has a question. I wanted you to turn to the Rule 32 issue that you raised, just to keep it moving. I obviously reviewed the transcript and the different instances that you pointed out where the judge sometimes says, I am sentencing you to 20 years, I am previewing, I'm sentencing you to 20 years, and he says it in different ways. And I just wanted you to put a fine point on why we should, despite the court staying at the end, I am previewing this sentence, why we should, I guess, ignore that and decide that, no, he actually did sentence him on that second day. Thanks for pointing me to this, Judge Murrell. I appreciate that. The problem here is that Judge Berman said this 10 times, number one. I've seen no other case from this court, or any other case, really, in which a judge states 10 times the exact sentence he will be imposing. But it was like a three-day, it was the sentencing over three days, he said it, I guess, over the course of two days. It was a lengthy sentence, and so he previewed a lot. No, that's right, Your Honor. But he did it 10 times. He explicitly stated the term that he was going to impose. He rebuffed the lawyer's attempts to speak, both the defense and the prosecution, their attempts to speak and make a record, at one point saying no thanks. He spoke for hours. I think this case is very similar to Gonzales, and it is very similar to a fairly recent case from this court. It's a summary order, but United States v. Avery. We rely upon it in our reply. In that case, the court reversed for exactly this Rule 32 violation because the judge, quote, made multiple statements indicating the specific sentence it would impose. And in that case as well, in Avery as well, the judge actually did grant the defendant an opportunity to speak, as Judge Berman did here, too. But the court held that it was not a meaningful pre-sentence allocution because, unfortunately, the defendant was not able to speak from a clean slate at that point. That is what happened here. Although you would agree that because the judge ultimately went with an upward variance, he was legally required to give you advance notice of his, the fact that he was considering that. So had he not previewed, or had he inadequately previewed, then we'd have the opposite argument here. So now, basically, ironically, the argument is he gave us too much of a preview. Well, I mean, Judge, he did, he did, he put out a notice like a couple of weeks before the sentence, too, that he was considering it. And so we were able to brief it, fortunately. But the problem is, is it's not just what the defense gets to say in our papers. You know, there's a lot of paper in this case. It's what Mr. Haddon gets to say on the record. After two days in which the judge had said, I'm going to give you 20 years, he had got to feel very dispirited. And, like, what he's about to say is not going to change anyone's mind. He's probably feeling pretty dispirited after that trial. But it's not just to, not just Mr. Haddon, but it's his counsel, right? His counsel having the opportunity to make argument on behalf of his client, which it seems happened here. It did happen, Your Honor, that's right. But the Rule 32 really does go to the pre-sentence allocution, and I think that's what the problem is here. Okay, we've kept you up for quite a long time. Thank you very much. Thank you very much, Your Honor. We're going to still give you two minutes of rebuttal. I'll be back. But we're going to keep it tight, 120 seconds. We have Attorney Kim for the government. So let's hear from the AUSA. And maybe if you could start, perhaps, with some of these sentencing issues. Yes. Maybe starting with the relevant conduct. Certainly, Your Honor. Are we on the same page that we're not in a world where a common scheme or plan is available for determining what's relevant conduct? Yes, we are in that world. And I think what happened at sentencing was simply an error in referencing the specific guidelines. So how is this different from Otters? So this case isn't particularly different from Otters. I would note in Otters that a defendant abused his stepson, and he recorded the abuse, and then he molested two other children at a sleepover. And that was a single event, right? So he said while you were abusing the statutory victim, you were also simultaneously abusing these other two. Therefore, it's all part of the commission. It's one event, right? It was one event. It was one event at the sleepover. But what the circuit said was that the acts were closely related as part of the same course of abusive conduct and occurred at the same time. Well, we can't go for course of abusive conduct, right? Because that's common scheme or plan, right? Because that's the same course of conduct. That's the language from common scheme or plan. Yeah, but that's not. But the way that the court was describing why the acts were closely related was because it was part of a course of abusive conduct. And here. Well, yeah, but again, course of conduct, that's in Section 8-2. So we can't go that route, right? We can't go that route under that specific guideline, but the course of conduct can be something that is considered under Otters. Can I ask you this? And, again, I think we had agreement that if we're just isolating the question of relevant conduct in terms of considering the non-offense conduct victims, it appears that we're talking about a potential two-point swing in the guidelines. Is the government arguing that if we were to find an error in that respect, that remand is required, or do you think that it is not because of harmlessness or some other reason? What would be your position if we thought that there was an error on that two points? Your Honor, remand would not be required. And the reason for that is that Judge Berman would have imposed the same sentence, and he stated many times on the record that the offense conduct here was, quote, unquestionably outside the heartland of the sentencing guidelines range and will be treated as such. That's at Appendix Page 1687. He explained, quote, it's somewhat, I don't know about irrelevant, and continues on to say that he's proposed a variance that is, quote, I believe fully supported by the facts of the case. That's at Appendix 1692. And the judge went through with significant care and detail the 3553A factors. And so based on the record, we know the court would have imposed the same sentence based on both the 3553A factors and the fact that he noted that he was setting aside the guidelines and that the guidelines calculation did not apply in this case. Well, as it were, to the point, he also said at Page A1700, that I propose the same sentence, the maximum sentence, or whether or not there were victim impact statements. So it would not impact. I think the actual trial record requires a maximum sentence. Isn't that what we should be focusing on? Yes, Your Honor. That's another example of how we know that Judge Berman would have imposed the same sentence. Now, counsel points out that he did reference the more than 200 and some odd victims. I see that at Page 1692 when he references the government having advised that at least 245 victims have come forward to report Haddon's sexual abuse. But the statement I just read to you about how he would have imposed the same sentence even without victims comes eight pages later. So it suggests that that is a dismissal or at least an acknowledgment that he would have done the same thing. Does he make any reference to the victims after that? I'm not sure if he makes reference to the victims after that. But I do know that he repeatedly stated that he was not considering anything outside of the trial record. And I would also note that with respect to the 245 victims, that Judge Berman, the way that he referenced that number was to say that approximately 245 individuals have come forward to report the abuse. And that was also included at Paragraph 22 of the PSR. What do you do with the fact that the trial record included testimony from more than the victims of defense conduct? It also had basically the 413, 404B victims that were admitted. Their testimony was admitted to show pattern, to show the various things, to show the defendant's intent and all that. So I would imagine maybe I'm projecting on the defense. I don't want to make an argument that they don't want to make. But what if their response to you was, well, yeah, okay, let's say that he did limit himself to the trial record. The trial record contains people who were not offense conduct victims, and therefore to count them is also to effectively include them as relevant conduct. And then we get into the same argument about what's relevant conduct. Yes, Your Honor. I think the 413 evidence could have been considered both as relevant conduct under the sentencing guidelines, but also certainly as 3553A factors, which the court based its sentence on. Well, the 3553A argument, I think, would get you to a harmlessness argument, right, that even if he got the relevant conduct called wrong, at best he was including, you know, what was it, five additional witnesses? Yes, Your Honor, five witnesses and two medical staff. So I guess then you would get the – arguably you'd get the five victims who were non-offense conduct victims, plus you would get those victims who were witnessed by the nurses, right? Yes. So the argument would be even if he included them, it doesn't matter, because if you were to consider them under 3553. The 3553 and 3661, it was clear that the scope of his abuse of conduct was so outrageous and shocking that it still would have warranted – the judge would have imposed, undoubtedly, the same 20-year sentence, right?  Is that the outline of the argument? Yes, correct. I want to point out just a few things with respect to the sentencing, the guidelines calculation. And one is, first, with respect to the vulnerable victim definition under Section 3A1.1B1 of the guidelines, not every victim has to have the same type of vulnerability. And so the guideline reads, point B, who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct. And so the fact here that there are various ways in which victims were vulnerable, which the district court referenced at sentencing and which were stated in the government submission, including the fact that many of the victims were targeted in the labor and delivery room and were pregnant and had an additional vulnerability, that would satisfy both the vulnerability of the victims and the large number of them. Can I ask you, just in terms of our looking in the record, to find the spots where the district court laid a basis for its finding that say certain adjustments should be made? For example, the vulnerable victim. I see – God bless you – there's paragraph 82 of the PSR that says, the defendant targeted and sexually abused his patients, some of whom were minors or pregnant, making them vulnerable victims. Yes, certainly. I guess two things. One is, did the district court ever expressly say, I'm adopting the factual findings of PSR? And number two, did the district court ever formally say in the record, I'm also adopting the guidelines analysis of the PSR? Like, is there a page in the record where they point us to, or did he not quite say it? I believe there is a page in the record. I don't have that specific page, but I can find it. But the discussion of the large number of vulnerable victims ends at appendix 1691, which is page 46 of the second day of sentencing. And so Judge Berman went through the details of the abuse of each statutory victim and discussed their circumstances, their particular vulnerabilities in discussing each victim, but then also discusses that the testimony of Willie Terry brings the number of vulnerable victims from 9 to 10, and then Rosalina Lozada, a nurse, brings the number of vulnerable victims much higher because she observed dozens of victims in the labor and delivery room being sexually abused and assaulted. There is a clarification on the record. This is on page 47 of the transcript, again, appendix 1691, in which the government clarified that the forms of vulnerability that the court had identified were at least 34 patients were pregnant, the fact that at least four patients had complicated medical issues, and the fact that at least four patients were longtime victims of the defendant. And the court responds, so that is perfectly true. And so that describes some of his analysis, and the preceding pages also, again, discuss the detail for each victim. I'll turn also to— Why don't we keep you, since I don't think there are any present questions, why don't we give you just five more minutes if there's something you want to add. Certainly. I am happy to turn also to the Rule 32 question, and I'd like to distinguish both Gonzalez and Avery. And so in Avery, which was a summary order, the district court said explicitly, quote, we will do whatever we have to do so that Mr. Avery ends up with 120 months. And that is very, very different from what Judge Berman did here, which was, yes, he referenced his proposed sentence several times, but in referencing that sentence, he repeatedly used phrasing like, I believe in my estimation, I am proposing, I think, I'm planning, I'm proposing. And so in previewing that sentence, the judge, as he had the discretion to do, was notifying counsel as to what he planned on proposing as the sentence, in part to allow counsel to address some of its concerns, which he walked through in great detail in the beginning of the second day of sentencing. I agree that perhaps Avery and Gonzalez are not spot on, but nor is Gates. And Gates, which you rely on, the court doesn't even really state a sentence. I think I have in mind what I'm going to impose. And so, I mean, I understand your point about Avery, but nor do I think Gates is a strong support for your position. Yes, so I think the case can be distinguished from Gates because the actual proposed sentence is discussed. But what I would say is that the district court here gave Haddon three opportunities to speak. One was after the second day of sentencing. This is on page 1717 of the appendix. And after the court gave the defendant the opportunity to speak, he declined. He declined because he was waiting for the court to give him the chart that he supposedly— that the court had made regarding the victims. Certainly, but— And so instead, we may make a statement after we get what the court is relying on. So I don't know if that's really a basis to deem them for not speaking at that time. Certainly, but based on what the defendant did say on the third day of sentencing, which was, I am very sorry for all the pain I have caused, I'm not sure that those statements in any way would have been— were affected by the district court's pending rulings. And on the second day—excuse me. On the third day, the defendant was given a second opportunity to speak, and he did speak. And then the defendant was given a third opportunity to speak again, and that's on page 1727. And I would note that on page 1726, defense counsel raised a challenge to one of the special conditions that the court had imposed about substance abuse testing. And there was a back-and-forth discussion between Judge Berman and defense counsel, which indicates that Judge Berman was open to continued discussion and hearing from counsel about the sentence. And so it wasn't until Judge Berman formally imposed sentence on the third day of sentencing— the defendant was given three opportunities to speak— and all of that satisfies, of course, Rule 32. Unless the court has any other questions, we would rest on our submission. Thank you very much. Thank you. Why don't we hear from the defense, if you would like. You have two minutes on the clock. I'll try to keep to two, Your Honor. Thank you. Just to go very, very quickly back to the relevant conduct issue, Judge Nardini, you brought up Otters, and we didn't get a chance to really talk about it. I want to say I do think this is sort of like a dueling battle between Otters and Wernick, and I think this is a Wernick case, quite frankly. We've laid it out in our briefing, and I won't belabor the point, but I think that clearly shows why this is not relevant conduct. So can I ask you—  I can't remember who mentioned it, but I think it's on page 1693, where the district court quoted from the government submission saying, Yes, I agree with it, and I'm only going to quote part. Regardless of the offense level calculated by the court, the defendant's conduct as proven at trial is not adequately captured in the guidelines. So you would agree that a judge is allowed under our law, if they say it with specificity, to say even if I'm wrong about a certain guidelines calculation, in light of the 3553 factors, I would impose the same sentence anyway. Why is that statement by the court not adequate to persuade us that even if you were correct about relevant conduct and that that two-point swing should not have happened, that basically he would have imposed the same sentence anyway? A couple of reasons, Your Honor. I just—this record does not assure us of the harmlessness. I understand that doctrine exists, and I fall prey to it all the time, but this is not that record. The judge did not say the same sentence. He never said I will impose the same sentence. I understand that that may be sort of formalistic to say that, but that is the language that this Court has blessed in the past. The judge did say a number of times I would impose a substantial upward variance, which is different. And we know that the guidelines calculation is the lodestar. That is the heartland from whence the judge begins. And I think given that— But you don't think that saying what I propose is the same sentence, the maximum sentence, whether or not there were victim statements, is the functional equivalent of what we have found, a clear articulation that the same sentence would have been imposed? Judge Radji, if that were it, maybe. But there's more on this record. The problem is what the Court has also pointed out, which is that the judge also referenced the 245 victims, the scores of victims, the large numbers. But he does that in a few pages beforehand, and then he makes this disavow, and that's at 1700, which I read. At 1719, he again says, I need not rely on victim impact statements to achieve the proposed sentence of 20 years of incarceration. So, Your Honor, I think this record is too equivocal. I don't want to speculate, quite frankly. And I just want to say that this actually points us right back to the Rule 32 issue. These two issues work in tandem. This is a judge who walked in, you know, in a horrific case. Don't get me wrong. You know, this is a horrific case that's worth a substantial sentence, it seems to me. But the judge walked in with an idea of what sentence he was going to impose. He didn't care what Mr. Haddon had to say, because, in fact, he spoke for hours without Mr. Haddon being able to say anything. What do you mean he didn't hear what he had to say? He asked him three times, and he talked once. Mr. Haddon simply chose not to say much. He heard everything he wanted to say. But, Judge, he said that he was going to impose a 10-year sentence well before that. He said that 20-year sentence 10 times before that. Okay, that's a different thing from saying he didn't hear what Mr. Haddon had to say. Mr. Haddon made a choice of what to say. He had excellent counsel with him. And he can choose to say as much or as little as he wants. That's up to him. But I don't see where the district judge precluded him from saying anything or dissuaded him from saying anything. Excuse me, Your Honor. I think I might have misspoke. I said care. I don't think that the judge cared what he had to say. And I don't think so because, unlike in the cases Gates and Avery, the court or as in Gates and Avery, the court did not actually mention anything that Mr. Haddon had said afterwards. And so I think these really dovetail together. And I think, Judge Rafferty, to get back to what you're saying, I just think that with a record like this, with a judge who has an idea of the sentence and is really sticking to it, and somehow that is being, this Rule 32 error is somehow being used to prove the harmlessness of the guidelines error, I just think that this record requires a remand, just to be sure and to be safe. Okay. Thank you. Thank you very much. For both of you, a very helpful argument. We appreciate it. We will take the case under advisement. Let's now turn to Ganell versus.